# NO. 12-14-00185-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *JONATHAN BAKER,*<br>*APPELLANT* | *§* | *APPEAL FROM THE 283RD* |
| *V.* | *§* | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | *§* | *DALLAS COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Jonathan Baker appeals his conviction for capital murder, for which he was assessed a sentence of imprisonment for life. In three issues, Appellant argues that the evidence is legally insufficient to support his conviction and that the trial court erred by allowing a witness to testify in violation of the court's pretrial discovery order. We modify the trial court's judgment to reflect no possibility of parole and affirm the judgment as modified.

## BACKGROUND

Appellant was charged by indictment with capital murder and pleaded "not guilty." The matter proceeded to a jury trial.

The evidence at trial showed that on December 7, 2011, eleven-month-old Joniah Baker had been at home all day with his father, Appellant. That afternoon, Joniah arrived at Children's Medical Center with a bluish, grayish tint to his skin, cold, and unresponsive. Medical professionals attempted to save Joniah's life, but he was pronounced dead on December 9, 2011. Many injuries, new and old, were found during examination and autopsy. The medical examiner ruled the death a homicide, and Appellant was charged with capital murder.

Ultimately, the jury found Appellant "guilty" of capital murder. The State did not seek the death penalty, and Appellant's punishment was assessed at imprisonment "for the rest of [his] lifetime." This appeal followed.

## EVIDENTIARY SUFFICIENCY

In his first issue, Appellant argues that the evidence is legally insufficient to support a finding that he acted intentionally or knowingly to cause Joniah's death.

### Standard of Review and Governing Law

The *Jackson v. Virginia*[1] legal sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the state is required to prove beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson*, 443 U.S. at 315–16, 99 S. Ct. at 2786–87; *see also Escobedo v. State*, 6 S.W.3d 1, 6 (Tex. App.–San Antonio 1999, pet. ref'd). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789; *see also Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The evidence is examined in the light most favorable to the verdict. *See Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789; *Johnson*, 871 S.W.2d at 186. This requires the reviewing court to defer to the jury's credibility and weight determinations, because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Brooks*, 323 S.W.3d at 899; *see Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. A "court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793. A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *See Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2217–18, 72 L. Ed. 2d 652 (1982).

The sufficiency of the evidence is measured against the offense as defined by a hypothetically correct jury charge. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App.

---

[1] 443 U.S. 307, 315–16, 99 S. Ct. 2781, 2786–87, 61 L. Ed. 2d 560 (1979).

1997).  Such a charge would include one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *Id.*

To prove Appellant guilty of capital murder in this case, the State was required to prove that he intentionally or knowingly caused Joniah's death, and that Joniah was under ten years of age.  *See* TEX. PENAL CODE ANN. § 19.03(a)(8) (West Supp. 2014).

## Events Preceding Joniah's Death

Joniah's mother, Tamika Sanford, testified that Joniah was born in December 2010. He lived with both of his parents and Appellant's mother.  Neither parent was working when Joniah was born. Sanford began working when Joniah was five months old. Sometime after Sanford began working, Appellant's mother moved out of the home, and Joniah was left in Appellant's sole care while Sanford was at work.  Sanford would go to work at either 5:00 a.m. or 7:00 a.m. and return home around 2:00 p.m. or 4:00 p.m.  Appellant would then leave to go "hang out" until anywhere from 10:00 p.m. to 2:00 a.m. before returning home.

On the morning of December 7, 2011, Appellant, Joniah, and Sanford rode together to Sanford's workplace.  When Appellant dropped Sanford off at work around 7:00 a.m., Joniah appeared fine.  On the previous night, he had been eating, drinking, sleeping, and behaving normally. Sanford called Appellant at around 10:00 a.m. on her lunch break, as was her routine. They had a very brief phone conversation in which Appellant told Sanford that Joniah was sleeping and did not indicate that anything was wrong.  Sanford did not hear from Appellant again until he called on his way to pick her up from work.  At that time, Appellant told Sanford that they needed to go to the hospital because Joniah's breathing was faint.

Dr. Jo-Ann Nesiama was the physician in charge of the emergency room when Joniah was brought in.  She testified that when Joniah arrived, he was not moving or breathing.  There were indicators that he had not been breathing for some time.  He was a bluish, grayish color and he was very cold.  After intubation, Dr. Nesiama saw blood coming from the tube that was placed into Joniah's lungs, which also indicated he had not been breathing for a while.

When Dr. Nesiama asked Appellant what happened to Joniah, Appellant stated that Joniah woke up sick that morning.  He said that he put him down for a nap, and that he woke up around 11:30 a.m. not acting like himself.  He stated that he woke up again at 3:00 p.m. still not

acting like himself, so he brought him to the hospital. Because Appellant's story did not seem to explain how Joniah's injuries happened, Dr. Nesiama had a social worker contact CPS and Dr. Matthew Cox, a board certified child abuse pediatrician.

That same evening, detectives with the Dallas Police Department arrived at the hospital and spoke with Appellant and Sanford. Appellant and Sanford did not provide any explanation for Joniah's injuries. Later that night, Appellant agreed to an interview at the police station. In the interview, Appellant told the police that he and Joniah had gone back to sleep after dropping Sanford off. He got Joniah up around 12:00 p.m., fed him, and began to bathe him in his baby bathtub.

According to Appellant, Joniah began to throw a fit during the bath. Appellant was soapy and scratched Joniah's back and legs trying to hold onto him. Joniah flung himself back, hit his head on the bathtub, and then fell sideways and hit his head again. Appellant patted Joniah's chest and said, "Stop tripping, fool." He took Joniah out of the bathtub and shook him a little, saying, "Look. You're tripping, man. Chill out for a minute, man. You hear me?" He put Joniah on the bed in front of the television with some juice and with pillows around him. When he was getting Joniah dressed to go pick up Sanford, he noticed that his breathing was short. He bit Joniah's heels when putting his pants on because he was in a hurry.

Some parts of Appellant's story changed during the interview. Appellant was arrested after the interview and charged with injury to a child. Joniah subsequently died after being taken off life support, and Appellant was indicted for capital murder.

**State's Expert Testimony**

Dr. Matthew Cox testified that he saw Joniah the day after he was brought to the hospital. Joniah was unresponsive and being kept alive through life support measures. Dr. Cox noted multiple linear skin injuries located on various surfaces of Joniah's body. The appearance of the injuries was consistent with that of a burn. Dr. Cox also noted bruising on both of Joniah's feet. The original imaging studies showed a healed rib fracture, and subsequent imaging studies revealed a new rib fracture as well.

Dr. Cox reviewed the ophthalmology consult, which showed diffuse intraretina, preretina, and subretina hemorrhage in both sides and retinal detachment in the left eye. He stated that the extensive and diffuse retinal hemorrhages were the most severe version of retinal hemorrhages and are seen in the most severe traumatic events.

4

Head imaging revealed a new hemorrhage on the back between the brain hemispheres and around the back surface of Joniah's brain. There were also fluid collections on both sides of Joniah's head that were concerning for older hemorrhage. Dr. Cox said that the older hemorrhage was at least ten days old based on the appearance, but he could not give an upper limit.

Dr. Cox testified that the symptoms Joniah presented with—altered breathing, altered muscle tone, being floppy—were symptoms of a severe head injury. He stated that Joniah would have been acting differently and exhibiting severe symptoms immediately after sustaining such a severe injury. He stated that the older head injury, which was milder, might have caused symptoms such as not eating as well, vomiting, and acting dazed, confused, fussy, and sleepy.

Dr. Cox spoke with Sanford and took a detailed history of Joniah's past, his recent symptoms, and what brought him to the hospital the night before. Sanford told Dr. Cox that she saw Joniah fall off the bed about a week and a half to two weeks prior to his hospitalization. She said that he cried, she consoled him, and he seemed normal afterwards. Sanford said that Joniah had a second fall a few days later when he was with Appellant. She did not witness that fall and did not provide any details of it.

Dr. Cox testified that the pattern of Joniah's head injuries was different from the pattern he sees in children who fall off a bed. Dr. Cox further testified that Joniah's injuries were not the type he would expect to see from a baby bumping his head on a plastic baby bathtub, or even a standard adult bathtub, even if the baby were having a seizure in the bathtub. He said that Joniah's brain injuries were the type that are seen after a severe and violent traumatic event, such as when someone injures a child or the child is involved in a motor vehicle collision.

Dr. Cox concluded that the history provided did not explain Joniah's injuries. He further concluded that the pattern of medical findings indicated at least two episodes of trauma with a new episode on the day he presented at the hospital. The injuries were consistent with a striking with or against an unknown object. According to Dr. Cox, the medical findings were consistent with intentionally inflicted injuries and child physical abuse.

Dr. Stephanie Burton is the medical examiner who performed Joniah's autopsy. Her examination revealed numerous injuries, both internal and external. Joniah's external injuries included bruises on his head; abrasions on his neck, chest, and back; and bruises suspicious for bite marks on both heels. He also had twenty-six burns, the majority of which were paired,

linear, and parallel, and measured one and three-fourths inches apart. Dr. Burton determined that the distance between these paired burns was consistent with the distance between the coils of a radiator-style space heater that was found in Appellant's home.

Internally, Dr. Burton found a subcutaneous area of hemorrhage in Joniah's chest, a subcutaneous contusion on his back, another on his left buttock, and a large area of contusion on his right lower back and buttock. Joniah also had two fractured ribs, one recent, one just beginning to heal, and another older one that had been healing for a while.

On Joniah's head, Dr. Burton found an area of hemorrhage under one of the two head bruises, and another area of hemorrhage in a third location. Thus, there were three impact sites on the head. After removing the skull, Dr. Burton found recent subdural and subarachnoid hemorrhages over the top and bottom of the brain. She stated that a child with such hemorrhages would have an immediate change in consciousness, including possible unresponsiveness and probable seizure activity. Dr. Burton also found an older hemorrhage, which she estimated to be less than fourteen days old but older than the new ones. An ophthalmologist and pathologist evaluated Joniah's eyes and found diffuse retinal hemorrhages, optic nerve sheath hemorrhage, optic nerve head hemorrhage, and a detached retina.

Dr. Burton testified that all of her findings together indicated acceleration-deceleration injury to Joniah. She concluded that he died of a closed head injury with the burns contributing to his death, and that the manner of death was homicide. She defined homicide as being caused by an intentional act of another person. Dr. Burton further opined that there was no type of accidental history that could explain Joniah's injuries.

Dr. Reade Quinton is a medical examiner who was present at Joniah's autopsy. He testified that there was a newer subdural and an older subdural. Dr. Quinton believed the older subdural to be months old. He did not believe that the older subdural caused Joniah's death. He agreed that Joniah died as a result of a closed head injury and that the manner of death was homicide.

**Defense Expert Testimony**

Dr. Janice Ophoven is a pediatric forensic pathologist who testified for the defense. She reviewed the reports, records, and specimens from Joniah's case and believed that he presented at the hospital with cardiac arrest. She opined that he suffered from complications of a chronic subdural hematoma that likely occurred sometime in July 2011. He then suffered subsequent

6

impacts in the days prior to his collapse. And on December 7, 2011, Joniah suffered sudden increased intercranial pressure and subdural bleeding, which led to his cardiac arrest that day. The cardiac arrest resulted in a lack of oxygen to the brain. According to Dr. Ophoven, this lack of oxygen to the brain was the cause of Joniah's death.

Dr. Ophoven testified that there was no evidence that Joniah had a severe violent impact on the date of his cardiac arrest. She said any number of things could have resulted in his sudden deterioration, including rough handling or an accident. On cross examination, Dr. Ophoven stated that the chronic subdural hematoma that occurred in July was caused by blunt force trauma to the head. She was not given a history of any traumatic event occurring in July.

**Analysis**

Appellant contends that the State's case against him was entirely circumstantial. Therefore, he argues that we should consider the existence of all alternative reasonable hypotheses and inferences in conducting our legal sufficiency review. However, the court of criminal appeals abandoned the alternative reasonable hypothesis construct for reviewing the sufficiency of the evidence in circumstantial evidence cases in *Geesa v. State*, 820 S.W.2d 154, 159 (Tex. Crim. App. 1991). We now use the same standard of review for both circumstantial and direct evidence cases. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

In support of his insufficiency claim, Appellant argues that the evidence does not support the idea that Joniah was not injured when he fell off the bed. He cites evidence that the carpet in the room was thin and without padding. Appellant cites other evidence that Joniah bumped his head on a coffee table in September 2011. He claims that the jury failed to recognize Joniah's previous trips to the emergency room for spitting up blood and vomiting. Appellant further cites Dr. Ophoven's testimony that she believed Joniah died as a result of a chronic subdural hematoma he sustained in July 2011. And he claims that the State failed to rebut evidence of a serious traumatic head injury occurring in July 2011. However, the State's experts agreed that a previous serious head injury occurred, but they did not believe it was the cause of death. The jury was free to disbelieve Dr. Ophoven and believe the State's expert testimony. *See Brooks*, 323 S.W.3d at 899; *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. And, as we have noted above, we are not required to determine whether the evidence excludes every alternative reasonable hypothesis other than guilt. *See Geesa*, 820 S.W.2d at 159.

Viewed in the light most favorable to the jury's verdict, the evidence shows that sometime after Appellant dropped Sanford off at work, while Joniah was at home alone with Appellant, he sustained a severe, intentionally inflicted traumatic head injury that resulted in his death. From this evidence, a rational jury could have reasonably inferred that Appellant caused Joniah's death.

The State further had to prove that Appellant caused Joniah's death intentionally or knowingly. A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. TEX. PENAL CODE ANN. § 6.03(a) (West 2011). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b) (West 2011). Proof of a culpable mental state almost invariably depends upon circumstantial evidence. *Lee v. State*, 21 S.W.3d 532, 539 (Tex. App.—Tyler 2000, pet. ref'd). Ordinarily, the culpable mental state must be inferred from the acts of the accused or the surrounding circumstances, which include not only acts, but words and conduct. *Id.* In considering whether an assault was committed with the requisite mental state for murder, we take into account the extent of the injuries and the relative size and strength of the parties. *Lindsey v. State*, 501 S.W.2d 647, 648 (Tex. Crim. App. 1973). Any violent assault on a young child may be reasonably expected to cause death. *Id.*

Here, Joniah's injuries were severe, extensive, and numerous. He had bruises, abrasions, burns, broken bones, and severe traumatic head injuries. He was an eleven-month-old child and Appellant a grown man. Based on our review of the record, we conclude that a rational jury could have found that Appellant was at least aware that his conduct was reasonably certain to cause Joniah's death. We therefore hold that the evidence is sufficient to support the jury's verdict. Accordingly, Appellant's first issue is overruled.

## DISCOVERY ORDER VIOLATION

In his second and third issues, Appellant argues that the trial court erred by permitting Dr. Nesiama to testify in violation of the court's pretrial discovery order.

Generally, notice of the witnesses that the state intends to call at trial must be given upon request by the defense. *Hamann v. State*, 428 S.W.3d 221, 227 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). A trial court's decision to allow a witness who was not on the state's witness list to testify is reviewed for an abuse of discretion. *Id.* Among the factors that an appellate

8

court considers in such a review are (1) whether the state's actions in calling a previously undisclosed witness constituted bad faith, and (2) whether the defendant could have reasonably anticipated that the witness would testify. *Id.*

In this case, trial began on a Tuesday, and defense counsel told the trial court that the State only gave her Dr. Nesiama's name "like Thursday of last week." Defense counsel said that she had received notice from the State that one of the witnesses previously disclosed would be unavailable for trial. The prosecutor told her that he would like to substitute Dr. Nesiama, and he provided Dr. Nesiama's cell phone number. Additionally, the State had tendered the emergency room records that Dr. Nesiama was to testify from to the defense "probably twelve to eighteen months" before trial. The trial court allowed the parties to question Dr. Nesiama outside the presence of the jury.

After that hearing, defense counsel objected to Dr. Nesiama's testimony on the grounds that allowing her testimony would violate the trial court's pretrial orders. Counsel stated that she relied on those orders in preparing for trial. And she argued that allowing Dr. Nesiama to testify would deprive Appellant of his Fifth and Sixth Amendment rights to effective assistance of counsel. The trial court overruled defense counsel's objection and allowed Dr. Nesiama to testify. However, the trial court limited Dr. Nesiama's testimony to Joniah's treatment and injuries, and that the criteria were met for her to alert the social worker. The trial court did not allow Dr. Nesiama to give her opinion as to whether Joniah's injuries were accidental or the result of abuse.

As part of Appellant's second issue, he argues that Dr. Nesiama's testimony should have been excluded from evidence because the State willfully withheld its intent to use her as a witness. But we have found no evidence that the State did so or in any way acted in bad faith. The record indicates that when the treating emergency room physician the State had planned to call became unavailable, the prosecutor notified Appellant's counsel that he wished to substitute Dr. Nesiama to give testimony regarding the same facts the other doctor would have. And he provided defense counsel Dr. Nesiama's phone number and told Dr. Nesiama to expect a phone call.

Furthermore, the record indicates that Appellant could have reasonably anticipated that Dr. Nesiama would testify. The prosecutor told the trial court that Dr. Nesiama's name was listed in the emergency room records. Those records were provided to Appellant twelve to

9

eighteen months prior to trial. Under these circumstances, we conclude that the trial court did not abuse its discretion by allowing Dr. Nesiama's testimony. Accordingly, we overrule the portion of Appellant's second issue regarding the trial court's discretion to allow the testimony.

Additionally in his second issue, Appellant argues for the first time that the trial court violated his Sixth Amendment right to confrontation of witnesses by permitting Dr. Nesiama to testify. In general, a claim is preserved for appellate review only if (1) the complaint was made to the trial court by a timely and specific request, objection, or motion, and (2) the trial court either ruled on the request, objection, or motion or refused to rule and the complaining party objected to that refusal. TEX. R. APP. P. 33.1(a); *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003). If a party fails to properly object to errors at trial, even constitutional errors can be forfeited. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). Specifically, a defendant waives his constitutional right to confront witnesses if he does not object to the denial of that right at trial. *Holland v. State*, 802 S.W.2d 696, 700 (Tex. Crim. App. 1991). Appellant did not object to Dr. Nesiama's testimony at trial on confrontation grounds. Thus, he did not preserve his complaint regarding his right to confrontation. *See* TEX. R. APP. P. 33.1(a). Accordingly, we overrule the portion of Appellant's second issue regarding his right to confrontation.

In his third issue, Appellant argues for the first time that the trial court violated his First, Fifth, and Fourteenth Amendment rights to a neutral and impartial judge by permitting Dr. Nesiama to testify. Due process requires a neutral and detached hearing body or officer. *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006). Absent a clear showing of bias, a trial court's actions will be presumed to have been correct. *Id.*

Here, Appellant bases his argument that the trial judge was not neutral and impartial on the judge's allowing Dr. Nesiama to testify in violation of the discovery order. We have already concluded that the trial court did not abuse its discretion by allowing Dr. Nesiama's testimony. We have reviewed the record and found no clear showing of bias. Therefore, we conclude that the trial court did not violate Appellant's right to a neutral and impartial judge. Accordingly, we overrule Appellant's third issue.

10

## ERROR IN JUDGMENT

Although neither party has raised the issue, our review of the record reveals an error in the trial court's judgment.  At trial, the trial court sentenced Appellant to imprisonment in the institutional division "for the rest of [his] lifetime."  The judgment, however, reflects the punishment as imprisonment for life not imprisonment for life without parole.

Under the penal code, a person convicted of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment for life without parole if the person was eighteen years of age or older when the offense was committed.  TEX. PENAL CODE ANN. § 12.31(a) (West Supp. 2014).  The record shows that Appellant was thirty years old when he committed the offense.  Therefore, his punishment is imprisonment for life without parole, and the judgment should be modified accordingly.  *See id.*; *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd) (appellate court has authority to correct trial court's judgment to make record speak the truth when it has necessary data and information).

## DISPOSITION

Having overruled all of Appellant's issues, we ***modify*** the trial court's judgment to reflect that Appellant's punishment is imprisonment for life without parole, and ***affirm*** the judgment as modified.

JAMES T. WORTHEN
Chief Justice

Opinion delivered June 30, 2015.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

11



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

JUNE 30, 2015

NO. 12-14-00185-CR

**JONATHAN BAKER,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 283rd District Court
of Dallas County, Texas (Tr.Ct.No. F-1300422-T)

THIS CAUSE came on to be heard on the appellate record and the briefs filed herein; and the same being inspected, it is the opinion of the Court that the trial court's judgment below should be **modified and, as modified, affirmed**.

It is therefore ORDERED, ADJUDGED and DECREED that the trial court's judgment below be **modified** to reflect that Appellant's punishment is imprisonment for life without parole; **and that as modified**, the trial court's judgment is **affirmed**; and that this decision be certified to the trial court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*